Good morning, Your Honor, and may it please the Court, Craig Stewart, appearing on behalf of the appellants. The District Court's ruling in this case prevented the jury from hearing the whole story, including critical items of evidence that directly undermine the plaintiff's theory of the case. And to highlight this, I'd like to focus on the events and the testimony that surrounded the plaintiff's absence from work in the July and August time frame, because I think this illustrates best the prejudicial effect, the importance of this evidence and the prejudicial effect of its exclusion. This was the critical time period just before the plaintiff's employment was terminated. At trial, he testified that at the beginning of August, he called up John Riley of Chevron's Employee Assistance Program, and explained that he had been given a couple of assignments in Southern California, and that his back had responded poorly to those assignments, and that as a result of that bad response from his back, he had lapsed again into using pain medication in an abusive way. He says that as a result of this conversation, he told the EAP counselor that he needed help, and that the EAP counselor suggested that he go to a clinic in Hawaii, and this is Mr. Peek's testimony, regarding the issue of pain medication dependence. So the story that the plaintiff was testifying to was that he went, he was absent from work, and he went to this rehabilitation clinic in this critical time period, right before his termination, to address a pain medication issue resulting from his back pain that had been exacerbated by his previous two assignments at the end of July in Southern California. And then this testimony then became the centerpiece, a critical piece of the plaintiff's counsel's closing argument. He talked about the plaintiff's, what led to the plaintiff's downfall. He told the jury that the plaintiff had been, had a great work history at Chevron, and that his back had only Is that true? I mean, his performance evaluations were excellent. Yes. And the latest, the one closest to his termination was excellent. He did have good work evaluations, and I think that is the point that creates the prejudice here, because the plaintiff's counsel used that to say he'd had this great work history, he'd never missed work. Repeatedly in the closing argument, the theme of the closing argument was the plaintiff had never missed work until, this is how we know that his back problem was caused by, had become as serious as the plaintiff claimed it was, and that it was caused by things happening at work, including this assignment in Southern California at the end of July, was that despite this great work history, and despite having not previously missed work, his life fell apart. His life fell apart in the summer of 2000, and it was a result of the back pain and the ensuing need, the accompanying need, for pain medication. That was the theory of the closing argument. Plaintiff's counsel argued he never missed work. This is what caused him to start missing work, and have all the problems that led to this man's downfall. And the plaintiff's counsel also argued it happened during this time frame, and the only evidence is that it happened from these events, namely what Mr. Peek had testified to, that he'd had back problems occurring at work that led to his dependence on pain medication, which then caused him to start missing all this work. It was a, it was a circumstantial case. Evidence that that isn't the case. You have the declaration of his, of the former spouse in the context of a child custody dispute. She recants that declaration in her deposition, right? Right? I believe so, yes, Your Honor. Okay. And then you have the self-admitted statement to the, to Mr. Riley that on one or two occasions, perhaps two as I recall, he ingested some illegal substance at a neighbor's house. Right? No, it was a little more than that. I mean, it was, it was more than that, and that's, this I think is the key point, Your Honor. In contrast to Mr. Peek's testimony about his conversation with Mr. Riley, in which, as Mr. Peek portrayed it, it was all about pain medication resulting from his bad back that had been exacerbated by the July assignments, Mr. Riley's notes said, the employee said he wanted to get some help for his alcohol problem. This is at page 140 of the excerpts of the record. He said, he stated that the stress of the divorce, scrutiny by the court, and his physical problems had led him to drinking in an abusive way, and that he wanted to get help. He also indicated that his use of prescription drugs for pain medication was out of control. Now, that is in stark contrast to Mr. Peek's testimony, that it was all about his use of pain medications, and that it all resulted from his back condition exacerbated by conditions at work. Mr. Peek was allowed to put in that story. Chevron was not allowed to put in this evidence, directly contradicting that, where the employee said he wanted to get some help for his alcohol problem. And yes, Your Honor, there was also testimony of a- So the drug issue is really the illegal substances, that's irrelevant. Well, it's both, Your Honor. It's the alcohol problem, which Mr. Riley's notes indicated was using alcohol in an abusive way. And then there was also, a couple weeks after that, there was another conversation in which Mr. Peek told Mr. Riley that he found himself drinking more and gradually fell into the use of illegal drugs, specifically cocaine, which he states that he used on several occasions. Right. So it was the use of cocaine on several occasions, but also the alcohol abuse, which the notes characterize as considerable, and that it had been resulting, at least in part, and I think the jury would be allowed to find primarily from the marital disputes, because this is what these notes reflect. So what you're saying is that because the district court would not allow your evidence in, it allowed counsel to argue that you'll hear nothing in the record other than the back problem, knowing that you can't do anything about it, because the district judge didn't allow the facts in that show exactly the contrary. I read the argument of counsel, and it concerns me as former trial judge, trial lawyer, these are the types of things you hope you never see, but did you object to the argument? I don't believe that during the closing argument that there was an objection, Your Honor. I think that's true. No objection during the closing argument. Was there an objection after the closing argument? The district judge prevented us from filing post-trial motions. At a post-trial conference, the judge said, I'm not going to take any post-trial motions. I'm not going to take your motion for a new trial. I'm not going to take a motion for judgment as a matter of law. I'm going to deem them to have been submitted, deem you to have made and preserved all of your arguments that would support a new trial or a judgment as a matter of law. And that's in the record. There's an order from the judge specifying all of the arguments that we were deemed to have made, and that she rejected. So your understanding is that that preserves the issue of whether the argument of counsel was so prejudicial that it inflamed the court and the case should be reversed, it flamed the jury and the case should be reversed? I think so, Your Honor. But as an additional point to that, I think it's not simply that this was improper argument, but it is a But if it's not objected to, the trial judge is deprived of the opportunity of perhaps instructing counsel or the jury to disregard certain statements. The trial judge has the opportunity to try to cure any unfair advantage at that opportunity at that time, and that was never done. Well, and this was the point I wanted to get to in response to Judge Wallace. The error here and the prejudice was the exclusion of the evidence during trial, preventing us from arguing and preventing us from cross-examining the plaintiff on his version of the events. And we are first using this closing argument of counsel to illustrate the prejudicial effect of that exclusion and the effect that it had on our ability to present our case. How did it relate to the termination? Excuse me? How did any of this relate to the reasons for the termination? I mean, that's what this case was about, is was he terminated on the basis, was there a breach on the contract claim of this return to work agreement? And there's two different theories here that it would be helpful for us to address separately. There's the tort theories, negligence and the unseaworthiness. And that's what I have been addressing to this point in my argument, that the, on that theory, the argument was that the conditions on the ship had caused the back condition, which led to him becoming disabled. And the point I have been making here is that this evidence was relevant to the jury's determination of whether there was negligence that caused the condition being complained of. And we were unable to present our story that said that the reason he was missing work was not because of a back problem and simply because of pain medication problems, but it was because of these other events going on in his life, and we were prevented from making that case. That's on the negligence and unseaworthiness. But you're not claiming that the incident was caused by him being under the influence of anything. And the under the influence part, that came much later, after he had a subsequent car accident and exacerbation and all that, and he was in this domestic situation, right? So I'm just, it's just not precise for me when you say that it's related to the negligence. To me, it seems unrelated. It's related to the issue of injury and causation. This client had a back condition that had existed for many years. And the question was, did, was the back condition, the back pain that he was complaining of, did it result from these events at work, or did it result from other circumstances going on in, or other circumstances going on in his life? And let me explain that, because I didn't make that very clear. The, the, the, the theory of the plaintiff's case was, look at our absences from work. Plaintiff got on the stand. He said, look, I was, I was work, I had a good history. I was working well. Then I had these problems at work. And that was the proof that they relied upon to show that this, it was not a preexisting back problem. He'd had the, the back problem for years, he said, and had not missed work. And then all of a sudden, in two hours. It's your closing argument issue, though. This goes back to the closing argument issue. But it also goes to the evidence that we were allowed to put in at trial. Well, let's hear you. This, to me, the logic is circular. I still don't understand the, the, the connection. Even if there were, even if the plaintiff's counsel had not made those, highlighted this the way that he did during the closing argument, we still had the testimony at trial of the, of the plaintiff himself attributing his absences from work to his back problem. And using, and giving that to the jury as a basis for why they should conclude that 2000, when he started missing all the work, showed that it was these events that had happened in 2000, as opposed to his preexisting condition. So you're not asking us to change anything because of the argument. If I understand your argument, you're saying that you're only pointing this out to show the necessary prejudice, because you have to, you have to demonstrate abusive discretion when the trial judge kept your evidence out. I, I believe that's correct, Your Honor. That the, that the ---- It is, it either is. I'm just trying to get your argument. But one part I don't understand is that you feel you've preserved the jury argument because the judge made a ruling that you couldn't bring a motion? Yes. After trial, you asked, Your Honor, whether there had been an objection after the closing argument. Yes. And part of my response to that was the judge precluded us from making any post-trial motions. If, if Your Honor's question is, well, did we object at the conclusion of the argument before the judge ---- So even if, if you had brought in a motion, the district judge might have said you're too late. But that doesn't make any difference to your argument, as I understand it. You're just trying to show that to demonstrate prejudice, rather than error, reversible error. Reversible error with respect to the, the argument itself. I think that's correct, Your Honor. That we're, there's a number of cases that say when we're trying to figure out, when we try to evaluate the prejudicial effect of an evidentiary ruling, one way to show the importance of that to the case is to look at the closing arguments of counsel. And that is primarily the way we're using it. I, I think I'd also like to make the point that if you read the transcript of the arguments at the beginning of the trial where the judge excluded this evidence, she made it very clear. Ask the question, what evidence are you talking about? How are you going to propose to introduce whatever evidence it is? The principal evidence, Your Honor, it would be the testimony from John Riley about these communication, conversations that he had. Involving the, taking the illegal drugs a few times. And the. Having an alcohol problem. And having an alcohol problem. That's it. And, well, that's the principal evidence. And I'd like to anticipate one argument, which is the plaintiff's argument. Well, those, you know, those were notes that are inadmissible and Mr. Riley didn't remember it, so none of that is admissible. The notes were admissible. They weren't excluded on the ground of inadmissibility. But they weren't hearsay. They were business record. They were recorded recollection. They were admissions against a party interest. So I think that was admissible. And Mr. Riley was called to testify. He was, he testified on the stand. And he could have testified to these events. Furthermore, Mr. Peek was on the stand giving this skewed version. Testified about taking illegal substances on a few occasions. And why was that relevant to anything in this case? The. Just that issue. Was that, just break it down. Was that relevant to any issue in this case? Yes, Your Honor. Why? It's relevant to the question of was his, were his back problems causally related to work conditions? And the plaintiff. Is taking illegal drugs on a few occasions with neighbors have to do with that at all? I understand I'm not making myself clear on this, so let me try it again. The plaintiff at trial to prove the causal connection said, look at what's going on in this case. What happened to me? My life fell apart. I started missing all of this work. That shows you, the jury, how serious my back injury was. And the timing here of, I had been sailing on all the way up until the beginning of 2000. And then all of a sudden I started missing all this work. And that shows to the jury, the argument was, that it was these work conditions that had caused my problem. Right. And the jury was told that he was addicted to painkillers, had become an abusive user of painkillers, right? Yes. Knew all of that. They just didn't know about the two examples of the illegal drugs, right? Correct. Well, and the alcohol abuse. It's not just two examples of using cocaine. Alcohol abuse in the context of the domestic relations dispute, which occurred later, correct? The domestic relations dispute was occurring right in the heart of this period in which he says that it was his back problems that was causing him to miss all this work. If you had gotten this evidence in, what inferences would you have drawn from that? That he didn't miss work because of his back? Correct. And that means then that his back really didn't hurt? That it would have directly rebutted his testimony that he went into the rehabilitation program to address pain medication issue. Yes, the jury was told about substance abuse. But the only thing that they could deduce from that was that it was pain medication, which played right into the plaintiff's theory that all of these problems he was having related to his back problems and the ensuing need for pain medication. And what we wanted to explain to the jury was that he was having difficulties and he was missing work. But it wasn't because of his back problems or because those had been caused by conditions of work. It was because, as he told Mr. Riley, it was the stress of his marital disputes. That's what led to his drinking in an abusive way. More than just cocaine on a couple of occasions, but an alcohol problem. And that is why he went in. Evidence that he missed work because he was under the influence of alcohol? That was not our argument, Your Honor. What was it then? The argument was that, contrary to his assertion that he missed work because of his back problem and pain medication problems, he was missing work because he needed help with an alcohol abuse problem that stemmed primarily from marital disputes, not from work conditions or a back problem. But he had already admitted that he missed work because he went into that program for a few weeks. As a result of substance abuse. And the only evidence the jury was allowed to hear about substance abuse was that it was Percodan. So the jury from that would logically conclude, well, Percodan, this just shows how serious his back problem was. And the plaintiff's counsel hammered on that all through trial, that the use of Percodan was a barometer for pain. And it showed how serious his back injury was. And I'd like to, my time is rapidly running out here, at least note for the Court and direct the Court's attention to our briefs where we pointed out that this is not simply relevant to the negligence and unseaworthiness claims, but also to the breach of contract claim. It was, correct, it was not known by the, Mr. Kaldow. Good determination. But it was known by Mr. Riley who negotiated this agreement and who made the determination that it had been breached. And the plaintiff testified that he was shocked and he was astonished that Chevron would take, that Mr. Riley, who made this decision, would take the position that he was precluded from taking Percodan. And this evidence, that the issue that was being addressed here was not simply Percodan, but was a broader substance abuse problem, would have directly rebutted those assertions. And so it's relevant to that point as well. Again, that's, to me it's just vague. I mean, you have this agreement, this termination agreement, and he's told, management is told that he was terminated because, or that he should be, they were told that he had violated this zero tolerance policy because he self-admitted, I think it says, the taking of two Percodan. That's the reason that Chevron itself terminated him, correct? They terminated him for violating this agreement, which Chevron understood to be an abstinence agreement that precluded him from taking any Percodan. Right. But the reason why this other evidence is relevant to that, it's relevant to understanding the terms of the agreement and why Chevron understood and interpreted it, and why Chevron had explained to him that even the taking of two Percodan would be a violation of that agreement. It's a, it's a, it goes to the meaning and the interpretation of the agreement, the understanding reached by the parties, and it's much more believable to a jury that Chevron would impose that type of an agreement, an abstinence agreement, if the jury understands the broader context that the reason why he had gone into the view of the jury. But that was explained to the person who terminated him. It doesn't need to have been explained to him, because the question is, what did the agreement mean? And the person who negotiated the agreement and who made the decision that had been breached, it's true that somebody else decided, okay, he's going to be terminated because he breached. But Mr. Riley made the decision that had been breached, and it was Mr. Riley who had been involved in the negotiation of the agreement, and who, and who did have this background, and was in the position to know why, what the terms were in the context of the, of the broader substance abuse issues for which he had just come out of the rehabilitation clinic. I see that my, my time has expired. I don't know whether I could get a couple of minutes to, to respond. Well, you didn't reserve any, any time, counsel, so. You're on. Good morning. I'm going to spend most of my time also on the 403 issue this morning. And I think that the, the key issue there, and I, and I, I'm going to respond, Judge Wallace, to your comments, which, which affect me. And, and I take very seriously that my closing argument disturbed you, and I'll get to that in a moment. But I want to talk about, quickly, a couple of things that I believe are thematic in the case that need to be addressed before I talk about relevance in the 403 issue, which Judge Fragerson has commented on. A couple of things. First of all, the, the issue of marine safety, obviously, is very serious, and something that Captain Peek took very seriously. But I want to point out that that was never an issue in the case. We, for example, never questioned Chevron's right to withdraw Captain Peek's clearance for, for safety-sensitive duties. Captain Peek, at the time, never resisted. In fact, he cooperated with the entire process. The question was whether, and only whether, the, that Chevron had a right to terminate this individual rather than accommodate his problems and his disability. And that was the question that was posed, ultimately, to the jury, number one. Number two, there is no evidence that Captain Peek ever as much as took an aspirin on one of these ships. In fact, the evidence is he was a zealous person who had, took the eight-hour rule that Chevron imposed and imposed a 36-hour rule on himself, never to go near his duties under the influence of these medications. And I think that's very important that we, that we clarify that, because the concern about environmental catastrophe is something that is so serious that I fear that it may influence the court subliminally. And so I want to put that out. The second thing is, and this is, this is equally critical, and that is that the, the, the question of whether or not Mr. Peek was an addict, whether he was dependent on pain medications, whether he abused alcohol, was never an issue in the case. In fact, we conceded that and were open about his dependence. We acknowledged, doctors that we called, his pain management doctors, testified that from the time Mr. Peek developed his back problems through the post-surgical rehabilitation period, he used and at times was physically dependent on prescription medications. Now, the, the jury did not hear about the fact that there was additional components to this about some alcohol abuse and, and non-prescription drugs, but they were never an issue in the case. I don't know where that ever would have gone anywhere. And there's this idea, Judge Wallace, that somehow I took unfair advantage of that. Well, what I was responding to was the argument that Chevron made consistently. Chevron chose to make Mr. Peek's character a big part of this case. I did not do that. We did not do that. They attacked Mr. Peek from the beginning to the end, and they, they claimed that he was not injured. They claimed that, that he was malingering. And, and that's what we responded to in the context of why was he taking this prescription medication. And so it was out there at all times, we were open about it, and it wasn't an issue whether he was dependent or whether you want to call it an addict. Judge Patel at some point said, what does his status have to do with anything? And we agree with that. So again, the idea that somehow we repress that has no bearing, no relevance, because it was not an issue of any consequence in the case. Critically also is the, is the allegation that we used to. In that part, maybe you could explain to me, when you argue, there is no evidence here that there was something that he was doing just for fun. And of course, they had kept out evidence of recreational drug use. Yes, Your Honor, that's a good point. Then there's a comment, you'll see no evidence this guy ever taking medication when he didn't have a back problem. And they have evidence to the country. I think that's what I was referring to. I'll address that, Your Honor. What, what I was, what I was arguing was, and, and the, and the, the, the record has no reference to Mr. Peek taking medications for fun, for recreational purposes. Certainly no evidence at all that he ever took prescription pain medications for anything other than a medical problem and a very predictable and common physical dependence. Which the pain medication doctors said, look, it is addiction. It is bad. It is something where if this individual is doing this with no medical problem, they would seek treatment. But here it's a necessary evil because we're compassionate and we treat pain. And what I was saying was that the allegation, and remember that the jury never heard about any recreational drug use. So what they were saying is he was using this prescription medication, implying he was doing it for recreational purposes. And that's what I was saying was not true. And how did we do that? We argued the medical evidence. I mean, I think Chevron was, took a very dangerous, if not reckless, position in this case. To take an individual who had radiological studies done, had MRIs, x-rays, he had a very serious back problem. The jury so found, by the way, and that finding has not been contested by Chevron. He had a serious medical problem. That's what we did. We went back and said, look, he has a serious medical problem. He did not do this for fun. And if you look, evidently, at the EAP files, one of the claims is that we took unfair advantage. And deprived Chevron of the right to use those files to rebut what we said. If you look, however, if you look, however, in the EAP records, John Riley's records, he says, and John Riley says this, this is at excerpts 142, it all started with physical pain. Peek needed help to manage his pain. Pain management was a big issue for Mr. Peek. Riley repeatedly stated in his notes and at trial, Captain Peek had a, quote, severe pain problem. And if you go back and look at this, that's exactly what happened. This man had an injury. He began to take prescription pain medications. Other problems ensued. So my argument to the jury was consistent with that record and was fair. We are not in a situation when an adversary, when there's a ruling that some evidence is excluded, and an adversary then makes an argument, in this case, that Mr. Peek didn't have a legitimate injury, that he was malingering, we are not, at that point, bound and therefore not allowed to argue the balance of the evidence, nor are we. Well, you certainly can argue the evidence, but it does seem a little unfair that you could make the statement that there is no evidence of recreational use here when Chevron and you know that there may be some evidence that Chevron would like to introduce that he did take, have some recreational drug use, that Chevron's been forbidden to introduce here. It's kind of a, it's a, you kind of got a free punch. Well, my, my, and I'd have to go back and look at the record, and I, and I, but my argument and my intent was to work within the confines of what they were saying, which is he never took this medication. This claim that he's doing this for fun is unfounded. There is no evidence, and there was no evidence, that Mr. Peek was taking these medications for fun, or for that matter, drinking abusively. In fact, he was, he was repentant in his response to the inquiry from Chevron. He went in there and came clean and said, I feel terrible about this. This all arose out of my problems with my back and then my divorce. And my point was, when, when Chevron came in, and I, and I represent semen all the time. This was one of the most heartless, I felt, ways to treat someone who was a, was a, was a lifer with that company. He was devoted to that company, and he had a spotless record. And he develops these human frailties, and they went after him relentlessly. And all I did is said that was wrong, that was unfair, and this was all, this was not because he was out having fun. And it was the medical evidence that we relied on to, to rebut those allegations. And there is no, the, the, the medical evidence, the findings of causation, although obliquely referred to, have not been contested by Chevron, have not been appealed. There is no claim that the finding of a severe medical condition, of medical causation, of manifestation while in the service of the fleet, of negligence and unseaworthiness, of work methods, which evidently violated, there's a, this argument within the context of, of model rule, model instruction 9.7, of us suggesting that the, a standard on unseaworthiness should be for a, an infrail or disabled individual. In fact, we argued and showed they violated the, the national standard for safe lifting practices, their own standards. None of those things have been contested. And that's what we argued, to say there is no basis to this. And I did never, I never stated, and we never argued that this man was a paragon of sobriety, as suggested, or that he had never in his life used illegal drugs, or that he never used alcohol. And the fact the jury heard about alcohol use, Chevron had unfettered access to do discovery post, outside of the very narrow, narrow confines of the EAP file, and there was nothing developed. And no argument presented that there was any, for example, failure, failure to mitigate because of substance abuse. Counsel, I just heard you argue two different things, and I want to just clarify this. One was that Chevron had, had right to do unfettered discovery, and I'm not terribly interested in the discovery. But I thought I heard you say that, that Chevron introduced evidence of alcohol use. They did. They introduced evidence of alcohol use in, in, in the medical records. Several years later, there was evidence that Mr. Peek had gone in for treatment, and that he had been, that he was, appeared to be intoxicated. I don't know if there was a test done or whatever, but Chevron certainly went out and tried to find evidence elsewhere of, of alcohol and, and, and, and, and anything else they could find. But again, the, the point is, and I, and I do think that critically, and I'm responding to this because I, I listened to argument earlier, I think a lawyer does know, and should know, what's, where the line should be drawn. And I try to be very careful about that. I'm passionate about what I do. I was very passionate about this case, and if my passions got the better of me, I apologize. But I'm responding to that to, to say there was never, and if it was a free punch, it certainly wasn't an, an intended free punch. There was no intent to do that. And the inquiry, for example, with the coworkers, was directed specifically to people who had no social relationship with this individual, to deal with the implication that there was a safety risk, that this individual was using these substances at work. That's why we went into that. We tried to be very careful, and tried to, to, to, to model our, our response blow by blow, block by block, to what Chevron was doing. And, and, and it is difficult. We do this all the time when we try cases. You can't mention insurance. So all of a sudden, the insurance adjuster is up on the stand, and everybody tries to work around the fact that, well, why is this individual testifying? What is their role? There becomes some level of artificiality that we have to deal with. And that's inevitable when you take a piece of the puzzle out, because it's deemed to be whatever, it's privileged, or it's prejudicial. But we certainly never tried to do that. And I don't think there's any instance where, for example, evidence was admitted that was, was not true, or we got witnesses to say something that wasn't true. And we never intended or tried, and I don't believe we ever did make any blanket statements that Mr. Peek never used drugs or alcohol at all. What we said was, this, he has a serious medical condition. This is not something he got involved with for fun. This is something that, that, that befell this man, and is serious. And, and, and we went through that, that whole litany. Remember, they didn't just terminate him when he had this disability. They took away his disability insurance. They took away his medical insurance. They never paid him maintenance and care. They literally threw this guy out, and that's what I was, that's what I was incensed by. Now, the, the, the, the, the issue of, of, well, let me mention another thing very quickly. That, that, I referred to this already a little bit, but, but, but what is not being appealed? I mean, these are the issues that I'm saying I don't think were really part of the case. They dispute about Mr. Peek's sobriety. An issue of whether he was an addict. Marine safety. But the issues, and I've gone through these a bit already, that were found, and it's important to, to, to acknowledge this, because Chevron implies, oh, the causation was weak. Or, or the finding on seaworthiness was weak. Well, none of that has been appealed. And I, I can assure you, I assume that if there were any indication that the record was insufficient, that the evidence was insufficient to support those findings, those issues would have been brought up on this appeal. And again, so what we have is, is an affirmation that the jury found that he was injured. These are facts we must deem as been, as having been established. And I'll talk about how it, it may be, or in my view was not, impacted by the exclusion of this evidence. But he was hurt. These are now facts. This injury was caused by his work. This did manifest in the service of Chevron's fleet. This was the result of unseaworthiness and negligence by the employer in the work methods. Violated all of their own standards. This individual was an employee who had not a single black mark on his record. And an employee who went to work. The testimony was, he was in suffering, in agonizing pain, and took no medications. They took him from the ship to the hospital for injections, because he was so devoted to this company. He loved this company. And this was never disputed. And this is a guy who, after he has his surgery, stops taking any medication, weans himself off the medications in his back, working during the trial. So yeah, I was, I was, I was impassioned, and if I took a few free shots, it wasn't intentional. It was a byproduct of the fact that I argue what I believe in. On relevance, I share Judge Pregerson's concern. I don't understand it. I really don't. The argument is that the jury didn't know why he was off work. They most certainly did. They knew exactly, in excruciating detail. They knew that he was off from, in February and March, because he was not fit for duty because of his back injury. They knew that in the June or July time frame that he had been taken off an administrative leave to investigate allegations of substance abuse. And we did not argue, oh well, that's what they said, but really he was off because of his work. There was, the jury saw every element of this man's medical history. What doctors he was seeing at the time. What the doctors were saying at the time. That's what we relied on. If I had relied on the absence of somebody at work, or a doctor had testified, it is my belief, with a reasonable degree of medical probability, that this condition was caused by this accident because he wasn't at work, that would have been appealed, of course. We proved all of that on hard, solid evidence. We spent a great amount of time, a great amount of money, to do that right. And I don't see any argument, or even relevant connection, or explanation, as how he was off work because of his drug or alcohol use. Or that the jury didn't know. They knew exactly. And again, we are allowed to tell the remainder of the truth. It's true. He went into the Hidemako Treatment Center because of his concerns about his use and abuse, if you want to call that. Abuse simply means that he's taking a lot of these medications. He's doing it. They're all prescribed by the doctors, by the way. He was concerned about that. He was concerned about pain management. Riley's notes reflect that. And the mere fact that there's something else doesn't mean we can't tell the rest of the story. It doesn't mean we can't defend the client or explain the evidence. And that's what we did. We explained the rest of the story. And we did our absolute best never to misconstrue anything. The question is, why did, maybe it'll tell us the real question of whether his condition manifested in the service of the fleet. I don't even understand that. How would that be? There's no evidence that he was intoxicated when he was in this accident, or the typical thing you would see. I don't understand, there's no connecting the dots. And there's really no connecting of the dots, even on, the argument is made, it's convincingly made. The arguments are put forward in the brief as the first point, the unseaworthiness, relevance. The clear argument, if there's any relevance to this, it has to go to the breach of contract claim. And I would imagine, this is, I always say, you use the 10 second description of a case to test an issue. If you say, would it be fair for a jury to know that an employee was using drugs and alcohol when he was terminated for violating a drug and alcohol agreement, you would say, certainly seems like that would be fair. This doesn't seem right. But when you look at it, because it was in the EAP context, no one who made the decision to terminate this individual, rather than put him on disability, knew anything about it. And in fact, the response to that, they knew nothing about it. They also, importantly, the Captain Caldell, the fleet manager, said, in fact, we don't consider anything. We don't consider any individual characteristics pro or con. And we did not consider them. So on one hand, we didn't consider his positive background, his clean record, his excellent review a month before he was fired. But we also didn't consider anything else. So the argument is, well, Riley knew. It went to the formation of the contract. Well, Riley said, and this is, again, in the evidence which was excluded, Peek, again, self-reported this. And Riley said, you breached the agreement. Peek said, does that mean I'm going to be fired? And he said, Riley said, this is at excerpts of record 144, management has to decide that, not me. So he had no opinion. There was no evidence that Riley felt that maybe the fact that these activities had taken place impacted what the punishment should be. He had no opinion on the penalty. And that's what we argued. We said, wait a minute, don't return him to going to sea. That's fine. In fact, we argued he was physically disabled from that. We certainly never contested Chevron's right to say, you're not going near any of our ships when you're taking these medications. However, the question was, do you terminate him? Do you take away his clearance for work and put him in an accommodating job or let him keep his disability benefits? Fine. We said, you don't terminate him. The whole dispute that the jury decided was that, what was the proper remedy? Riley knew nothing about that. Riley had nothing to do with that. That was all Chevron management who knew nothing about it. So I start by talking about the things that maybe hit me in my heart when a Judge Wallace says he's disturbed by my conduct. And I'll remember that, and I'll remember that in my next closing argument. I take that to heart. But the fact is, this was not relevant to anything in the case. It did not tend to prove anything in the case, and that's what justifies Judge Patel's ruling in the case. And certainly, if there was an objection to my argument, it had to be raised, and it had to be raised before the jury was dismissed, not in a post-trial motion. That's what the cases say. I'm sorry I can't cite them, but the law is very clear on that. And Judge Patel was never given an opportunity to rectify that. And again, when you look at the standard here, it was her decision beyond the pale of reasonable justification, totally without logic or reason. Should we send this case back for a two-week trial, 35 more witnesses, all of those party and judicial resources? This is a balls-and-strike call. Maybe you, each of you, would call this differently, but it's well within the bounds of basic discretion. When you look at these questions of relevance, when you look at the potential prejudice, when you look at all of the things that I've discussed, which is what we've discussed with the Court. So I think on these issues that Chevron's appeal on this issue should be denied. I'll submit on the briefs on the other two arguments, and as well as our cross-appeal, thank you. All right, we thank both counsel for the argument. The case is submitted, and the Court will stand in recess.
judges: Wallace, Bybee, Pregerson